UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 24-20187 |
| | Honorable Laurie J. Michelson |
| v. | |
| FRANCES BRIEANNA BRYANT, | |
| Defendant. | |

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS [70] AND SETTING EVIDENTIARY HEARING ON ADDITIONAL MOTIONS TO SUPPRESS [69, 84]

In 2023, Livonia police officers began investigating Barry Willis for drug trafficking. During their investigation, officers saw Willis leave from a house on Littlefield Street in Detroit on his way to sell drugs to a confidential informant. Eventually, the officers obtained a warrant to search Willis' residence, his business, and the Littlefield house.

Although the investigation had centered on Willis, when a number of officers arrived at the Littlefield house to execute the warrant, they found Frances Bryant. Bryant said she was the house cleaner, but the officer leading the search arrested her based on the existence of a large drug operation in the Littlefield basement. The police then interviewed Bryant. She informed them that she was Willis' girlfriend and that their meeting place was the Littlefield house.

Based in part on the information that Bryant provided during her interview, the officers obtained a warrant to search three cellphones that they had seized at the

Littlefield house. Two belonged to Bryant, and at least one contained evidence that she was involved in the drug operation at Littlefield. Given her post-arrest statements and the evidence on her phones, the government has charged Bryant with, among other things, conspiring with Willis to distribute fentanyl.

Bryant has filed three motions to suppress: one challenging her arrest and two challenging the search of her phones. For the reasons provided below, the Court finds that Bryant's arrest was unlawful and thus will GRANT her motion to suppress the evidence obtained as a result of her arrest. (ECF No. 70.) And as further explained below, the Court will set an evidentiary hearing on the other two motions.

## I.

## A.

In 2023, Livonia police officers began investigating Barry Willis for drug trafficking when a confidential informant told Officer Sean Tamer that "Blue," who owned a gas station in a particular area of Detroit, had been selling heroin. (*See* ECF No. 78-2, PageID.504.) Using Google maps and some databases, Tamer was able to connect Barry Willis with the gas station. (*See id.* at PageID.504–505.) He also found a photo of Willis, which the informant confirmed was the person he knew as "Blue." (*See id.* at PageID.505.)

In February 2024, Tamer directed the first of two controlled buys from Willis. Tamer had the informant call Willis' cellphone and arrange a heroin purchase. (*Id.* at PageID.505.) At the arranged meeting place, an officer watched as Willis arrived

in his vehicle, the informant got in and out of Willis' vehicle, and Willis drove off. (*Id.*) The substance bought from Willis tested positive for fentanyl. (*Id.*)

The second controlled buy took place in March 2024. Earlier that month, an officer who followed Willis departing from his gas station saw Willis enter a residence on Littlefield Street in Detroit. (*Id.* at PageID.506.) The day of the buy, an officer observed Willis exit the Littlefield house and get into his vehicle. (*Id.* at PageID.507.) When Willis drove off, officers followed. (*Id.*) Willis stopped on his way to meet the informant, and officers observed a transaction that, in their view, was "consistent with" a drug sale. (*Id.*) When Willis met the informant, the buy took place in a similar fashion to the first. (*Id.*) And as before, the substance purchased from Willis tested positive for fentanyl. (*Id.*) Later that day, an officer observed Willis leave the Littlefield house, engage in another transaction "consistent with" a drug sale, and then drive back to the Littlefield house. (*Id.* at PageID.508.)

Using the information gained from investigating Willis, Tamer sought and obtained a search warrant. The Littlefield Warrant (as the parties call it) permitted a search of Willis' gas station, his home in Clinton Township, and the Littlefield house in Detroit. Among other things, the Littlefield Warrant allowed officers to search these locations for "any and all records or documents* pertaining to controlled substances," which, according to the asterisk, included digital records. (*Id.* at PageID.500–501.) And, "[i]n order to search for any such items," the Littlefield Warrant permitted officers to seize and search "[a]ny . . . cellular telephone" that they found at the three locations. (*Id.* at PageID.501.)

3

**B.**

In March 2024, Livonia police officers, led by Sergeant Andrew Coletta, executed the warrant on Willis' three properties. (*See* ECF No. 94, PageID.606, 608.) At Willis' gas station, they found $3,000 and a gun. (ECF No. 29-3.) At his home in Clinton Township, officers seized $134,000 in cash, a gun, and a key to the Littlefield house. (*Id.*) They also found Willis and arrested him. (*See* ECF No. 94, at PageID.606–607.)

Once Willis was in custody, Coletta and his team executed the warrant on the Littlefield house. After the officers broke through a side door, someone Coletta was unfamiliar with came out the front door: Frances Bryant. (ECF No. 94, PageID.628, 664; Hardin Bodycam, 00:00–00:20.)

As Coletta led the team inside, Sergeant William Hardin stayed with Bryant outside. (ECF No. 94, PageID.628.) Bryant told Hardin that she did not live at the residence. (ECF No. 78-4, PageID.514.) When Hardin asked if Bryant was "[h]ere at a bad time?" Bryant explained, "I just cleaned the house, so I just stayed last night." (ECF No. 78-4, PageID.514.) Hardin would later explain he found this statement suspicious. (ECF No. 94, PageID.631.) When Hardin asked Bryant if she had encountered anything while cleaning, Bryant motioned to the upper levels of the residence and responded that she "only" cleaned upstairs. (Hardin Bodycam, 01:20–01:30; *see also* ECF No. 94, PageID.631–632.) In time, Bryant asked Hardin who was the subject of the warrant, and Hardin responded by asking who paid Bryant to clean the residence. (Hardin Bodycam, 05:19–05:54; ECF No. 94, PageID.632.) Initially,

4

Bryant responded a "third party," but after Hardin said that the first name on the warrant was "Barry," Bryant stated that she cleaned for "Mike." (ECF No. 78-4, PageID.517; *see also* Hardin Bodycam, 05:30–06:11.)

Meanwhile, Coletta and other officers searched the Littlefield house. On the main floor, they found two large monitors mounted to a wall, each displaying feeds from several perimeter cameras. (ECF No. 94, PageID.610; Coletta Bodycam, 00:59–01:30.) In the living room (which led to the front door where Byrant had exited), officers found a gun and, in the wall at the top of the stairs, a money counter. (ECF No. 94, PageID.616–617; Coletta Bodycam, 02:40–02:57, 03:09–03:11.)

Although the main floor and loft contained no drugs, the basement was a different story. When Coletta reached the basement, he saw, in his words, the "largest" drug-trafficking operation that he had seen in his 14-year career. (ECF No. 94, PageID.605, 612.) The basement contained around 40 kilograms of fentanyl, digital scales, pill presses, and other tools of the drug trade. (*See* ECF No. 78, PageID.476; Coletta Bodycam, 03:40–05:20.) Almost immediately upon seeing the operation in the basement, Coletta, referring to Bryant, declared, "Well, she's going to jail." (ECF No. 94, PageID.618; Coletta Bodycam, 04:33–04:35.)

After the officers finished a sweep of the house, Coletta had a "very brief" conversation with Hardin. (ECF No. 94, PageID.613, 619, 633.) At that point, Colletta still had no idea who Bryant was. Hardin recalled, "I told [Coletta] that [Bryant] told me she was the cleaning lady and I've never came across a cleaning lady in my two years of narcotic search warrants. And [Coletta] pretty much said the same thing."

5

(*Id.* at PageID.634–635; *see also id.* at PageID.619–620.) For his part, Coletta informed Hardin that there was a large drug operation inside the house. (*See* ECF No. 94, PageID.619–620, 634.) "[B]ased on the large scale and the very apparent drug operation," Coletta arrested Bryant for possession with intent to deliver narcotics. (*Id.* at PageID.613, 623–624.)

On the day of her arrest, Tamer interviewed Bryant at the police station. During her interview, Bryant admitted that she was Willis' girlfriend of two to three years (ECF No. 78-5, PageID.536), that she knew Willis was married and had another house (*id.* at PageID.527, 538), that they would see each other at the Littlefield house (*id.* at PageID.538, 540), and that one of the guns that was recovered in the Littlefield house was hers (*id.* at PageID.536). Bryant further admitted that in the two weeks before the search, she had stayed at the Littlefield house a few days a week. (*Id.* at PageID.529, 535.)

## C.

About 20 days after searching the Littlefield house, Robert Kim, one of the Livonia police officers involved in the investigation of Willis, sought a warrant to search three cell phones recovered from Littlefield. (ECF No. 78-3, PageID.512–513.) In his affidavit, Kim described the drug operation in the Littlefield basement and that two guns were recovered from the house. (*Id.* at PageID.512.) He stated that Bryant was present when officers searched the Littlefield house. (*Id.*) And, apparently referring to Bryant's interview statements, Kim stated, "Bryant admitted to officers that she [w]as staying at [the Littlefield house] for approximately two years

and stays at the residence three to four days a week." (*Id.*) Kim added that Bryant had also admitted that two of the three phones—a white-silver Samsung and a gray-black iPhone—were hers. (*Id.*)

The same state court judge who had issued the Littlefield Warrant reviewed Kim's affidavit and issued what the parties refer to as the Cell-Phone Warrant. (*See generally* ECF No. 78-3.)

Months later, federal agents searched Bryant's phones. (*See* ECF No. 97-2, PageID.727.) The government says that this search uncovered evidence that Bryant was "involved in obtaining pill presses and other narcotics manufacturing materials" for the Littlefield drug operation. (ECF No. 78, PageID.479.)

The government charged Bryant with, among things, conspiring with Willis to distribute fentanyl. (*See* ECF No. 34, PageID.273.)

### D.

Bryant has filed three motions to suppress.

In one, she argues that her arrest was unlawful and that any evidence obtained as a result of her arrest should be suppressed. (ECF No. 70.) The Court held an evidentiary hearing on this motion on September 12, 2025. (*See generally* ECF No. 94.)

Bryant also seeks to suppress evidence obtained from searching her phones on the grounds that (1) the affidavits in support of the two warrants did not provide probable cause to believe evidence of a crime would be found on her phones and (2) both warrants fail the Fourth Amendment's particularity requirement. (ECF Nos. 69,

84.) (In her briefs, Bryant only expressly challenged the Cell-Phone Warrant as not sufficiently particular, but based on the hearing, the Court believes Bryant intended to make that challenge to the Littlefield Warrant, as well. (*See* ECF No. 94, PageID.677.))

## II.

The Court begins with the lawfulness of Bryant's arrest.

The Fourth Amendment prohibits "unreasonable" seizures, which means that to arrest someone, officers must have probable cause to believe that person committed, or was in the process of committing, a crime. *See Fisher v. Jordan*, 91 F.4th 419, 425 (6th Cir. 2024). Although probable cause is not "readily, or even usefully, reduced to a neat set of legal rules," *Illinois v. Gates*, 462 U.S. 213, 232 (1983), there are guidelines. On one end of the spectrum, officers need "more than a reasonable suspicion" to arrest someone. *Fisher*, 91 F.4th at 419. On the other, officers can arrest someone without believing it is more-likely-than-not that the person committed a crime. *See id.*

At bottom, this Court must decide whether the "facts and circumstances" known to the arresting officer would warrant a "prudent man" in believing that the arrestee "committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964).

## A.

Not only do the parties disagree on the answer to that question, they also disagree on one of the question's premises: the "facts and circumstances" known to

8

Coletta, the arresting officer. From the government's perspective, everything that Hardin knew from his conversation with Bryant is part of the factual basis for assessing probable cause, whether he shared it with arresting officer Coletta or not. (*See* ECF No. 94, PageID.646; ECF No. 96, PageID.710.) This would include, for example, that Bryant purported to be the unusual cleaner who spends the night at the house she cleans. From Bryant's perspective, the probable-cause determination cannot be based on information that Hardin knew but did not tell Coletta. (ECF No. 97, PageID.721–722.) In other words, the parties dispute the breadth of the collective-knowledge doctrine.

In its well-trodden form, the collective-knowledge doctrine applies when one officer has information amounting to probable cause and directs another officer, one who lacks the required factual basis, to effectuate the arrest. *See United States v. Hensley*, 469 U.S. 221, 231 (1985). This is sometimes referred to as "vertical" collective knowledge. *See Commonwealth v. Privette*, 204 N.E.3d 967, 975 (Mass. 2023) (discussing doctrine at length).

But some courts have departed from this familiar road and adopted a "horizontal" collective-knowledge doctrine. This version comes in a few varieties and has divided courts. *See id.* at 976–78 (summarizing split); *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (same). At its most expansive, the horizontal collective-knowledge doctrine permits an arrest based on information known to officers working as a single unit—even if the information was not communicated to the arresting officer. *See United States v. Ramirez*, 473 F.3d 1026,

1032 (9th Cir. 2007); *Privette*, 204 N.E.3d at 978 (explaining that "the minority view . . . has allowed information to be aggregated amongst officers even absent evidence of any sort of communication between them").

The Sixth Circuit, however, has not travelled far down the horizontal-collective-knowledge road. The Court typically requires some sharing of information or, at a minimum, a joint decision to arrest. *See, e.g., Bauman v. Millisor*, No. 21-1527, 2022 WL 35470, at *4 (6th Cir. Jan. 4, 2022) (explaining that officers reasonably concluded plaintiff was disorderly based on both their individual observations and the information they "communicated . . . among themselves before placing [plaintiff] under arrest"); *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (explaining that the "collective-knowledge doctrine" permits an officer to "conduct a stop based on information obtained from fellow officers" (internal quotation marks omitted)).

*Collins v. Nagle* provides a useful waypoint. There, four investigators surveyed a property for unlawful mining, and, when they tried to leave, they found that two individuals had blocked the exit road with a truck. *Id.* at 491. While some of the investigators had seen this act before, it was new to Nagle. *See id.* at 491, 494 n.3. With the road blocked, the four investigators "discussed among themselves" what to do with the two obstructors. *See id.* at 492. After their discussion, Nagle and one or two of the other investigators proceeded to arrest the pair. *Id.* In later court proceedings, the arrestees argued that because Nagle was unaware of the prior road-blocking incidents (as well as other inculpatory information known to the other investigators), their arrest was not supported by probable cause. *See id.* at 494.

10

Relying on its prior decision in *United States v. Woods*, the Sixth Circuit rejected that argument: "Since the knowledge of the mining investigators working together on the scene and in communication with each other is mutually imputed, we do not require that every arresting officer possess all of the information that, when amassed, gives rise to probable cause." *Nagle*, 892 F.2d at 495; *see also United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) ("[W]hen a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.").

Here, unlike the officers in *Nagle* and *Woods*, Hardin and Coletta did not jointly decide to arrest Bryant (and did not share information beyond that Bryant said she was a cleaner). The record could not be clearer that it was Coletta—and Coletta alone—who decided to arrest Bryant. (ECF No. 94, PageID.624, 633.)

That makes *United States v. Blair* the proper pathway. There, two officers—Munday and Holmes—were working as a team to surveil a suspected drug house. 524 F.3d 740, 744 (6th Cir. 2008). Munday parked where he could see the house; Holmes parked where he could not. *Id.* at 745. In time, Munday saw what he believed to be a "hand-to-hand drug transaction" at the house. *Id.* When the suspected buyer drove off, Munday radioed Holmes, but "Holmes was unsure to which vehicle [Munday] was referring." *Id.* at 750. Even so, Holmes stopped a car for a broken light. *Id.* at 745, 749. Holmes then extended the stop beyond what was necessary to issue a ticket, and, eventually, additional officers and a canine unit arrived on scene. *See id.* at 745–46,

11

752. The officers found drugs on the driver, Blair, which led to his indictment. *Id.* at 746.

In arguing that the stop was properly extended, the government relied on *Woods* and the fact that Munday had seen an apparent hand-to-hand drug transaction. *See id.* at 751. But Munday had not communicated that information to Holmes before Holmes had extended the stop. *See id.* at 751–52. The Sixth Circuit explained: "Had Officers Munday and Holmes decided together to stop Blair, information known only to Officer Munday would be relevant." *Id.* at 752. But "the officers did not make a collective decision to stop Blair, and thus Officer Munday's knowledge of the hand-to-hand transaction cannot be imputed to Officer Holmes." *Id.*

That reasoning fits perfectly here: had Coletta and Hardin decided together to arrest Bryant, information known only to Hardin would be relevant. But Coletta alone decided to arrest Bryant. (ECF No. 94, PageID.623–624.) So Hardin's unspoken knowledge cannot be imputed to Coletta.

The upshot is that only the following "facts and circumstances" will be considered in assessing probable cause to arrest Bryant: (1) there was a massive drug operation in plain view in the basement of the house and indicia of drug trafficking on the other floors, (2) Bryant was alone at the house when the officers executed the warrant, and (3) Bryant said she was the cleaner. (*See* ECF No. 96, PageID.712 (reciting facts known to Coletta if collective-knowledge doctrine did not apply).)

## B.

So would a prudent officer believe that a person is engaged in drug trafficking because she was alone at a residence with a large, unhidden drug operation and claimed to be the cleaner?

Start with two points of law. On the one hand, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 92 (1979). And this rule applies in the context of a drug house: a person's "[m]ere presence at a place where the government believes illegal drugs will be distributed will not provide probable cause for an arrest on narcotics charges." *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976). On the other hand, a person's presence at a drug house is a fact favoring probable cause to arrest. *See United States v. Romero*, 452 F.3d 610, 618 (6th Cir. 2006) ("[D]rug dealing is 'an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.'" (quoting *Maryland v. Pringle*, 540 U.S. 366, 373 (2003))).

A few cases illustrate how these points of law apply in circumstances similar to the one Coletta faced.

In *United States v. Robertson*, officers had several reasons to believe that a house was being used to make methamphetamine, including that Johnson, who had an outstanding arrest warrant for manufacturing methamphetamine, appeared to be residing there. *See* 833 F.2d 777, 778 (9th Cir. 1987). When officers approached the house to execute the warrant, they saw "a woman, later identified as Steeprow,

leaving the house on the walkway." *Id.* at 779. The officers drew their guns and told her to freeze. *Id.* Other officers proceeded inside and found Johnson and "equipment characteristic of a crank lab." *Id.* The officers then asked Steeprow if they could search her backpack and, when she refused, they detained her at the scene until they got a warrant. *See id.* They then searched Steeprow's backpack and found meth recipes. *See id.*

The Ninth Circuit concluded that officers had effectuated an arrest when they detained Steeprow at gunpoint, *id.* at 781, and that they had done so without probable cause, *id.* at 783. The court reasoned that while it was "undisputed that the officers had probable cause to believe that criminal activity was afoot in the house," the government could not identify anything other than Steeprow's "mere proximity to Johnson and the house" that would lead a prudent person to think she had committed a crime. *See id.* at 783. "For all that was then known to the officers, Steeprow was an innocent visitor." *Id.* at 782.

The same court later reached the opposite conclusion on slightly different facts. In *United States v. Valencia-Amezcua*, authorities were investigating Valencia-Rodriguez for drug trafficking. 278 F.3d 901, 904–05 (9th Cir. 2002). When an officer arrived at his house, Valencia-Rodriguez led them to an upstairs bedroom where Amezcua was "sitting on a bed with two other men." *Id.* at 904. After Amezcua and the others were directed outside, officers found a hidden door blocked by the bed. *Id.* at 905. Inside the secret room was evidence of drug manufacturing. *Id.* The officers thus arrested Amezcua. *Id.* The Ninth Circuit found that Amezcua's arrest was

14

different from Steeprow's because the house "contained a large-scale methamphetamine production operation requiring the participation of several workers," Amezcua's proximity to the secret room suggested that he may have exited it before the officers' arrival, and Amezcua's position on the bed "suggested a purpose to deter the officers" from discovering the secret room. *Id.* at 907–08 (distinguishing *Robertson*).

A third case suffices to complete the mere-visitor picture. In *United States v. Pace*, officers had a warrant to search Savides' condominium for evidence of unlawful gambling. 898 F.2d 1218, 1223 (7th Cir. 1990). When officers arrived at the condo, Savides permitted them to enter. *Id.* Officers then saw Besase exit the kitchen, Pace in the den, and a third person exit a bedroom. *Id.* In those three rooms, officers found 10 kilograms of cocaine and $63,000. *Id.* So the officers arrested all four individuals. *Id.* In concluding that Besase's and Pace's arrests were supported by probable cause, the Seventh Circuit noted that there were "large amounts of cocaine and money lying in the open," that "Savides trusted Pace and Besase enough to have them at his home with the money and cocaine out in the open," and that Besase and Pace "exit[ed] rooms in which the police found large amounts of either cocaine or money." *Id.* at 1240.

Although this case has similarities to *Pace* and *Valencia-Amezcua*, there are material differences. To be sure, as in those cases, officers found Bryant in a house with a large amount of drugs. And, similar to the condo owner in *Pace*, Willis trusted Bryant to be in a house with an open and obvious drug operation in the basement and

15

some other indicia of drug trafficking on the other floors. But, unlike in *Valencia-Amezcua*, Bryant did nothing that could be interpreted as an attempt to deter officers from discovering the drug operation. *Cf.* 278 F.3d at 907. And unlike the officers in *Pace*, Coletta's team did not walk in on what appeared to be an ongoing drug deal. *Cf.* 898 F.2d at 1223. Further, in both *Pace* and *Valencia-Amezcua*, the officers had reason to think that the arrestees had recently exited rooms where drugs were out in the open. *See Pace*, 898 F.2d at 1240; *Valencia-Amezcua*, 278 F.3d at 907. In contrast, Bryant was never seen anywhere near the basement.

Bryant's situation better aligns with Steeprow's. The officers in *Robertson* knew that Johnson was suspected of drug manufacturing but knew nothing about Steeprow before they arrived at the suspected drug house. The facts are similar here: the officers' investigation had focused almost exclusively on Willis (indeed, the warrant affidavit nowhere mentions Bryant), and Coletta knew nothing about Bryant before he arrived at the Littlefield house. (ECF No. 94, PageID.664.) And when officers arrived to arrest Johnson, they found Steeprow exiting the house. So too here. True, Coletta had discovered the drug operation before he decided to arrest Bryant, whereas it is unclear whether the officers who arrested Steeprow had discovered the meth lab before arresting her. But even before entering the house that Steeprow had exited, the officers had good reasons to think that drugs were being made there. *See Robertson*, 833 F.2d at 778 (noting that it was "undisputed that the officers had probable cause to believe that criminal activity was afoot in the house"). But that was not probable cause to arrest Steeprow. *See id.* at 783. In short, as with Steeprow,

16

Bryant's mere presence at a residence used for drug trafficking is not probable cause to believe she was *involved* in that enterprise.

What of the fact that Bryant had claimed to be the house cleaner? (*See* ECF No. 94, PageID.634.) True, a fishy reason for being in a home with a massive drug operation could be the "something more" that removes a case from *Ybarra*'s ambit. *See Ybarra*, 444 U.S. at 92 (providing that proximity to criminal activity, "without more," does not amount to probable cause). But in this Court's opinion, Bryant's statement that she was the cleaner—unadorned by the suspicious facts that Hardin did not communicate to Coletta—is not fishy enough for a reasonable officer to immediately believe that Bryant was a participant in the drug operation. While drug traffickers are unlikely to invite Molly Maid into the hub of their drug operation, they might trust a close friend (or girlfriend or family member) to clean their residence—even with drugs left out in the open. Like everyone else, people who sell drugs for a living have close friends and family who are not their "coworkers." And here, based on Coletta's bodycam video, the house appeared quite clean.

To summarize, the officers' investigation had centered on Willis. When they arrived at the Littlefield house, Bryant happened to be there. And as soon as Coletta saw the large drug operation in the basement, he believed that Bryant should "go[] to jail." (ECF No. 95, PageID.618, 623.) But at that moment, a prudent officer would not have arrested Bryant, because doing so would have meant arresting her based on her mere presence at a drug house. *See United States v. Stewart*, No. 20-56, 2020 WL 6255676, at *7 (E.D. Wis. Oct. 23, 2020) ("[W]hile a homeowner's willingness to leave

17

a visitor in the presence of drugs is a factor in establishing probable cause to arrest, it, alone, does not support probable cause."). While Coletta later learned that Bryant said she was the cleaner, that explanation for her presence is not suspicious enough to take this case out from under *Ybarra*'s umbrella. Accordingly, the Court narrowly finds that a prudent officer, knowing only what Coletta knew, would not yet have believed that Bryant possessed the drugs at Littlefield with the intent to deliver them.

The government resists this result with *Fisher v. Jordan*, 91 F.4th 419 (6th Cir. 2024). (*See* ECF No. 78, PageID.482–483.) But that case is not like this one. There, officers obtained a warrant to search Steven and Leslie Fisher's home on suspicion of a marijuana grow operation in the garage. *Fisher*, 91 F.4th at 423. When officers arrived to execute the warrant, Leslie told them that she knew her husband had been growing marijuana in the garage, but that she never went in the garage and did not know the operation's extent. *See id.* The officers arrested Leslie and Steven for possession with intent to deliver, *id.* at 425, and, after the charges against Leslie were dropped, she sued the officers for unlawful arrest, *see id.* at 424. The Sixth Circuit found that the officers had probable cause to arrest Leslie because (1) she had admitted to using marijuana grown by her husband, *id.* at 426, (2) she "lived at and owned the site of the grow operation," *id.*, and (3) the "house was filled with signs of drug trafficking," *id.* at 427. Although that third fact, to a much lesser degree, is present here, the other two are not: Bryant did not admit to using the drugs at the Littlefield house, she did not own the Littlefield house, and, at the time of her arrest,

18

officers did not know that she often stayed there. So there were more reasons for an officer to think Fisher possessed drugs than to think Bryant did.

Accordingly, the Court will grant Bryant's motion to suppress evidence obtained as a result of her arrest. (ECF No. 70, PageID.442.)

### III.

That determination leads to more questions. Because Bryant's arrest was unlawful, the Court must determine what evidence was obtained as a result of her arrest. This in turn involves considering how events would have unfolded had Bryant not been arrested.

*United States v. Waide* makes this point. There, when officers arrived to execute a search warrant on Waide's apartment, Waide was not present, but his mother was. 60 F.4th 327, 333 (6th Cir. 2023). She phoned Waide, informing him of the warrant and asking him to return to the apartment. *Id.* When Waide arrived, he offered to retrieve what the officers were looking for (a recording device), but the officers nonetheless threatened to execute the warrant. *See id.* This prompted Waide to confess that he may have marijuana in the apartment, which, in turn, led to an inspection of his car where marijuana was also found. *See id.* The officers' threat to execute the warrant also caused Waide's mother and his cousin to try to destroy evidence inside the apartment. *See id.* at 334. In response, the officers obtained a key from Waide and entered the apartment; when they did, they found sinks clogged with a "white substance." *See id.*

As it turned out, the warrant was invalid. *Id.* at 335.

19

In deciding what evidence should be suppressed, the Sixth Circuit examined what would have happened absent the officers' attempt to execute an invalid warrant. The court reasoned that Waide's mother would not have phoned Waide to return home, in which case officers would not have inspected his car. *See id.* at 340. Further, absent the threat of executing the invalid warrant, Waide would not have confessed to having marijuana in his apartment, and Waide's mother and cousin would not have attempted to destroy the drugs inside the apartment. *See id.* at 340–41. As such, the Sixth Circuit found that the drug evidence the officers found as a result of their threats to execute an invalid warrant should be suppressed. *See id.* at 343; *cf. United States v. Cooper*, 24 F.4th 1086, 1096 (6th Cir. 2022) (framing inevitable-discovery question as, "[i]f the illegal protective sweep had never happened, would officers have sought Walton's consent to search?").

Here, some aspects of the "what would have happened?" inquiry are straightforward. For instance, had Bryant not been arrested, officers would not have brought her to the police station, and she would not have been interviewed. In which case, she would not have admitted to authorities that she had been meeting Willis at the Littlefield house for years and that, shortly before the search, she had been staying there several nights a week. (*See* ECF No. 78-5, PageID.535, 540.) And, although somewhat less straightforward, it would not be too difficult to excise Bryant's interview statements from the Cell-Phone Warrant and then assess the pared-down affidavit for probable cause. *See United States v. Davis*, 430 F.3d 345,

357–58 (6th Cir. 2005) (removing unlawfully obtained information from affidavit and reassessing for probable cause).

But without further development of the factual record, important aspects of how events would have unfolded are unknown. In particular, had Bryant been free to leave, would officers have searched her purse? And if the answer is "no," then (presumably) they would not have discovered the Samsung phone inside of it. In which case, it becomes entirely unclear whether authorities would have ever searched that phone. (Bryant's iPhone might be a different story: officers found that phone in the living room and, had Bryant never claimed ownership of it, the officers presumably would have searched the phone under the assumption that it was Willis'.)

The existence of the Littlefield Warrant does not render this inquiry about the phone in Bryant's purse moot. The Court is well aware that the government maintains that independent of the Cell-Phone Warrant, the Littlefield Warrant permitted the seizure and search of Bryant's phones. (*See* ECF No. 96, PageID.713–14.) Assuming (without deciding) that the government is correct on that point, it at most establishes that Coletta and his team had authority to seize and search Bryant's Samsung phone, i.e., that they could have done so. But "could" is not "would." The former depends on the validity and scope of the Littlefield Warrant; the latter depends on the officers' intent. *Cf. United States v. Siciliano*, 578 F.3d 61, 69 (1st Cir. 2009) (providing that whether officers would have sought a warrant absent an unlawful search is a factual inquiry that turns on the officers' intent).

Given that it is unclear whether officers would have searched Bryant's Samsung had they not arrested her, and because it appears that phone contained inculpatory evidence, the prudent approach is to hold a second evidentiary hearing. Moreover, because the prior evidentiary hearing centered on Bryant's arrest, a second hearing would permit exploration of issues specific to her phones.

## IV.

For the reasons given, Bryant's motion to suppress fruits of unlawful arrest (ECF No. 70) is GRANTED. An evidentiary hearing to determine which fruits of the arrest should be suppressed is set for November 3, 2025, at 8:30 a.m. Additionally, the parties should be prepared to address (with evidence) whether officers would have used the Littlefield Warrant to search Bryant's phones had they not sought or had they not been granted the Cell-Phone Warrant.

Dated: October 21, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE